UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

CAITLIN MAHONEY,

Plaintiff,

Index No. cv-14-4131

MEMORANDUM OF LAW
IN SUPPORT OF
MOTION FOR
DEFAULT JUDGMENT

- against -

AMEKK CORP. d/b/a CYPRUS AVENUE,
A&O CORP. d/b/a BLACK SHEEP PUB,
52 5th AVENUE CORP.,
ANTHONY McERLAIN, individually; and
ADAM SMITH, individually,

Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff Caitlin Mahoney respectfully moves this Court to enter default judgment against

Defendants AMEKK CORP. d/b/a CYPRUS AVENUE, A&O CORP. d/b/a BLACK SHEEP PUB,

52 5th AVENUE CORP. and ANTHONY McERLAIN, individually, pursuant to Fed. R. Civ. P.

55(b)(2) and Local Rule 55.

Plaintiff commenced this Complaint on July 3, 2014. (Docket # 1.) The Complaint

alleged that Defendants AMEKK CORP. d/b/a CYPRUS AVENUE, A&O CORP. d/b/a BLACK

SHEEP PUB, 52 5th AVENUE CORP. and ANTHONY McERLAIN, individually, unlawfully

failed to pay Plaintiff minimum wages, overtime and "spread of hours" compensation.

Defendants further unlawfully withheld tips earned by Plaintiff during the period that she worked

for Defendants. In so doing, Defendants violated the Fair Labor Standards Act ("FLSA") 29

U.S.C. § 201, *et seq*., ("FLSA"), and the New York Labor Law § 190, *et seq*., ("NYLL"), specifically including The Wage Theft Prevention Act, NYLL § 195, and the Hospitality Industry Wage Order, New York's Compilation of Codes, Rules and Regulations ("NYCRR") tit. 12, § 146. Defendants have acted with reckless disregard for Plaintiff's right to minimum wage and overtime compensation under the FLSA, and for Defendants' corresponding obligations under federal law. The three corporate defendants are all owned by individual Defendant McErlain. (Ex. F, G, H, I, J, N.)

Plaintiff served the original Complaint upon the corporate Defendants via Federal Express on July 9, 2014, with waivers of service. (Ex. K.) Plaintiff also served Defendant McErlain via Federal Express on July 9, 2014 with a waiver of service. (Ex. K.) Delivery and receipt was confirmed on July 10, 2014 at 1:14 PM, and signed for by one M. Sanchez. (Ex. L.)

Plaintiff then filed an Amended Complaint on September 23, 2014, adding Defendant Adam Smith individually. (Docket # 8) (Ex. T.) Plaintiff served the Amended Complaint upon the corporate Defendants by way of service upon the New York State Department of State on September 29, 2014. (Ex. M.) Plaintiff then served the Amended Complaint and Summons upon Defendant McErlain individually at his home address on November 1, 2014. (Docket # 12.) An Affidavit of Defendant McErlain's non-military status was completed on December 29, 2013. (Docket # 15).

Plaintiff filed a Second Amended Complaint on August 21, 2015 (Docket # 47). Plaintiff served the Second Amended Complaint and Summons upon the corporate Defendants by way of service upon the New York State Department of State; 52 5th Avenue Corp was served on August 25, 2015. (Docket # 50) **(Ex. N)**; Amekk Corp. and A & O Corp. on August 31, 2015 (Docket #'s 48-49) **(Exs. O & P)**. Plaintiff then served the Second Amended Complaint and

Summons upon Defendant McErlain individually at his home address on September 5, 2015. (Docket # 51.) **(Ex. Q.)**

Defendants all failed to appear, answer or otherwise defend themselves in this action, with the exception of Defendant Smith, with whom Plaintiff settled individually for the sum of $7,500.00, which is far less than the total amount owed, based on his proportionally small role and liability in this matter. The Clerk therefore entered a Certificate of Default on February 9, 2015. (Docket # 20) To date, none of the remaining Defendants have made any response whatsoever, nor have they requested additional time in which to file an Answer or otherwise respond. On the contrary, it is quite clear that Defendants' approach to this dispute since day one has been to ignore it entirely.

## ARGUMENT

### I.     STANDARD OF REVIEW

In deciding whether to enter a default judgment (or vacate a default judgment after entry) pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, the Court accepts as true the facts alleged in the complaint and the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability. *Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d 108, 120-21 (E.D.N.Y. 2013); *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011). A defendant's default is therefore an admission of all well-pleaded factual allegations in the complaint (except those relating to damages). *Rosas v. Subsational*, No. CV 11-2811 FB MDG, 2012 WL 4891595, at *2 (E.D.N.Y. Sept. 11, 2012) *citing Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981). *See also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d at 158 ("a default judgment constitutes an admission of liability"); 6 Moore's Federal Practice ¶ 55.03[2] at 55–16 (2d ed. 1988).

3

No evidentiary hearing is required of this Court in ordering a Default Judgment. *Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d at 120-21. While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." *Id., quoting Fustok v. Conticommodity Servs., Inc.,* 122 F.R.D. 151, 156 (S.D.N.Y.1988) (collecting cases), *aff'd* 873 F.2d 38 (2d Cir.1989); *see also Hosking v. New World Mortgage, Inc.,* 570 F. App'x 28, 31 (2d Cir. 2014). The Second Circuit Court of Appeals has held that "it [is] not necessary for the District Court to hold a[n evidentiary] hearing, as long as it ensured that there was a basis for the damages specified in a default judgment." *Fustok,* 873 F.2d at 40.

After the default judgment is entered, the defendant has the opportunity to contest the damages claimed. *Finkel v. Universal Elec. Corp.*, 970 F. Supp. 2d at 120-21. The movant need prove "only that the compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." *Jemine v. Dennis*, 901 F. Supp. 2d 365, 373 (E.D.N.Y. 2012), *citing Greyhound,* 973 F.2d at 159. If the facts are sufficient to establish liability as to the asserted claims, the court must then conduct an inquiry to determine the amount of damages to a "reasonable certainty." *Id., citing Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir.1999). The moving party is entitled to all reasonable inferences from the evidence it offers. *Id.; See also Romanowicz,* 577 F.3d at 84; *Au Bon Pain,* 653 F.2d at 65.

In calculating damages, this Court may rely on the plaintiff's submissions and need not require a hearing; the Second Circuit has expressly endorsed this approach so long as the court has "ensured itself that there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997) (quoting *Fustok v. ContiCommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir.1989)).

Generally, an employee-plaintiff under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Santillan v. Henao*, 822 F. Supp. 2d 284, 293-94 (E.D.N.Y. 2011), *citing Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, (1946), *superseded on other grounds by* The Portal-to-Portal Act of 1947, 29 U.S.C. § 251, *et seq.* However, while the plaintiff bears the burden of proof in a motion for default judgment, such burden is minimal: "the district court need only ensure that the plaintiff has established the amount of damages to a 'reasonable certainty.'" *Hosking* 570 F. App'x at 31, *citing Credit Lyonnais,* 183 F.3d at 155.

As the Supreme Court recognized in *Anderson,* employees seldom keep records of the exact hours they work. *Anderson v. Mt. Clemens,* 328 U.S. 680 at 687. Therefore, the easiest way for an FLSA plaintiff to discharge her burden of proof is, generally, to "secur[e] the production of such records" from the employer, who has the duty to maintain them under section 11(c) of the FLSA. *Id.* However, by defaulting, the defendant necessarily deprives the plaintiff of the necessary employee records required by the FLSA, thus hampering the plaintiff's ability to prove her damages. *Id.* In addressing the problem of proof faced by employees, the Supreme Court in *Anderson* held that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*

A plaintiff can meet this burden "by relying on recollection alone." *Doo Nam Yang v. ACBL Corp.,* 427 F.Supp.2d 327, 335 (S.D.N.Y.2005); *accord Park v. Seoul Broadcasting Sys. Co.,* No. 05 CV 8956, 2008 WL 619034, at *7 (S.D.N.Y. March 6, 2008); *Chan v. Sung Yue Tung Corp.,* No. 03 Civ. 6048, 2007 WL 313483, at *24 (S.D.N.Y. Feb. 1, 2007). Moreover,

"[w]here the employer has defaulted, [as here, the employee's] recollection and estimates of hours worked are presumed to be correct," *Pavia v. Around the Clock Grocery, Inc.,* No. 03 CV 6465, 2005 WL 4655383, at *5 (E.D.N.Y. Nov. 15, 2005). "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with [the FLSA's record-keeping provisions]." *Anderson,* 328 U.S. at 688. *See also Siemieniewicz v. CAZ Contracing Corp.*, No. 11-CV-0704 JG JO, 2012 WL 5183375, at *10 (E.D.N.Y. Sept. 21, 2012)(where an employer has defaulted and failed to maintain or produce any time records, the court may rely on the plaintiff worker's recollection and estimates of the hours he worked). New York law goes one step further and requires that employers who fail to maintain the appropriate records "bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123-24 (E.D.N.Y. 2011); *citing* N.Y. Lab. Law § 196–a.

With this framework in mind, this Court has specified that "[i]n determining whether to grant a default judgment, the court may consider "numerous factors, including 'whether plaintiff has been substantially prejudiced by the delay involved [ ] and whether the grounds for default are clearly established or in doubt.' " *Rodriguez,* 784 F. Supp. 2d at 123-24, *citing O'Callaghan v. Sifre,* 242 F.R.D. 69, 73 (S.D.N.Y.2007) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2685 (3d ed.1998)). Other factors for the court's consideration include (1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment."

*Rodriguez,* 784 F. Supp.2d at 123-124, *citing Mason Tenders Dist. Council v. Duce Const. Corp.*, No. 02CIV.9044 (LTS)(GWG), 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003).

In the Second Circuit, "willfulness" in this context simply refers to conduct that is "more than merely negligent or careless." *S.E.C. v. McNulty,* 137 F.3d 732, 738 (2d Cir.1998). Further, a "default is deemed willful where the defendant simply ignores the complaint without action. *United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Assocs.,* 755 F.Supp. 1195, 1205 (S.D.N.Y. 1989). Where, as here, the adversary process has been halted because of an "essentially unresponsive party," default judgment is appropriate to protect the non-defaulting party from "interminable delay and continued uncertainty as to his rights." *Id.* at 1205. Importantly, a finding of willfulness on the part of the defaulting party does *not* necessarily require a finding of bad faith; for example, "the court may find a default to have been willful where the conduct of counsel or the litigant was egregious and was not satisfactorily explained." *Chudomel v. Dynamic Recovery Servs., Inc.*, No. 12-CV-05365 NGG RLM, 2013 WL 5970613, at *3 (E.D.N.Y. Nov. 8, 2013), *quoting SEC v. McNulty,* 137 F.3d at 738.

## 1. <u>Defendants' Default is Willful</u>

Apart from Defendant Smith, the Defendants in this action have proved themselves "essentially unresponsive" by their utter failure to appear, plead, defend, answer or respond to the Complaint in any way, despite the fact that Defendants were all duly served. (Docket # 10, 11, 12, 15, 16) (Ex. K, L, M). This egregious failure to respond, unaccompanied by any explanation indicates willful default. *Mason Tenders,* 2003 WL 1960584, at *2 ("the Court finds that the Defendants, having failed to respond in any way to the Summons and Complaint or otherwise make any appearance in this action and having failed to provide any explanation for its failure to defend, have defaulted willfully.")

Process was served by Federal Express upon McErlain individually, as well as upon all three corporate Defendants, of which McErlain is owner, through the Secretary of State. (Ex. M.) Defendants' failure either to collect mail sent to them or to change the address for service of process constitutes a willful disregard of legal process and a willful default. *In re Martin-Trigona*, 763 F.2d 503, 505-06 (2d Cir. 1985), *see also* N.Y. Bus. Corp. Law § 408 ("Each domestic corporation…shall, during the applicable filing period…file a statement setting forth … [t]he post office address within or without this state to which the secretary of state shall mail a copy of any process against it served upon him or her."); *see also id.* § 306 ("Service of process on a registered agent may be made in the manner provided by law for the service of a summons, as if the registered agent was a defendant."). *See also Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06 CIV. 14226RLCRLE, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) ("Since Defendants have been entirely unresponsive, their continued failure is willful.") Moreover, Defendant McErlain sent Plaintiff a text message indicating he knew that she was suing him and that he was angry about it. (Ex. D.) This evidence shows that Defendant's deafening silence in this litigation is a deliberate snub, and not the result of excusable neglect. Rather, Defendants appear to be flouting their legal obligations and the rules of this Court in order to show Plaintiff how little they care about their obligations and how little they plan to cooperate going forward.

Further, Defendant McErlain has sent Plaintiff several other text messages that illustrate not only his knowledge that he owes Plaintiff wages, but also his calculated attempts to evade this lawsuit. For example, on August 6, 2014, McErlain sent Plaintiff a series of text messages, stating [*sic*]:

> I'll reach out u mid afternoon about ur monies owed…You were [employed] and paid by 52 5th Ave Corp. Dba Cyprus Avenue. Adam [Smith] owns that company not me. Adam [Smith] has a lot of money. Legally Adam [Smith] is who you sue. I merely hold the liquor license in my name. I am not an employer…Small claims

will get you your money in 2 weeks. U don't need a lawyer….sue him. That's how you get your money…Adam B. Smith…Ur W2 will confirm the employer info.

(Ex. E.) Here, Defendant McErlain admits that Plaintiff is owed unpaid wages, and then falsely claims that the bars' former manager, Adam Smith, is in fact the owner of 52 5th Ave Corp. d/b/a Cyprus Avenue. This is not correct; in reality, Defendant McErlain owns all three corporate defendants, including 52 5th Ave Corp. d/b/a Cyprus Avenue (Ex. F, G, H, I, J, N). Additionally, Plaintiff never received a W2 from McErlain or any of the Corporate Defendants, because, as McErlain previously told her, she was being paid "off the books." (Mahoney Aff., ¶ 58). Clearly, McErlain has no intention of honoring his obligations, and will boldly misrepresent the facts in order to evade responsibility. This is willful default *writ large*. Defendants' recalcitrance in this regard weighs heavily in favor of granting a default judgment to Plaintiff.

### 2. **Defendants Have Made No Showing of a Meritorious Defense**

Since Defendants have never appeared or otherwise defended this case in any way, there is no evidence of any defense, meritorious or otherwise. *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06 CIV. 14226RLCRLE, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008); *See, Mason Tenders,* 2003 WL 1960584, at *2 ("Since Defendants have failed to proffer any defense and are therefore deemed to have admitted the well-pleaded allegations of the Complaint…the second factor – of whether Defendants have a meritorious defense – need not be addressed.")

### 3. **Plaintiff will be Unfairly Prejudiced if the Default Judgment is Not Granted**

A showing of willfulness and lack of defense under the first two prongs, i.e. willfulness and lack of meritorious defense, is sufficient by itself to support the entry of a default judgment, even without analyzing the third prong of prejudice. *SEC v. McNulty,* 137 F.3d at 738, *see also Garden City Boxing Club, Inc. v. DeJesus*, No. 05 CV 3898 (SJ), 2006 WL 1155166, at *3

(E.D.N.Y. Apr. 27, 2006) ("[G]iven that the Court has concluded that Defendants' default was not the result of mere negligence or carelessness and that they lack meritorious defenses to Plaintiff's claims, the Court need not make a finding of prejudice to deny Defendants' motion to vacate the Court's Order"). However, in the instant case, the third prong is also fulfilled, for the reasons stated below:

Prejudice to the non-defaulting party is established by showing that the movant will be injured, for example by "increased difficulties of discovery, or … greater opportunities for fraud and collusion," if the motion is vacated or not entered. *77 Charters, Inc. v. SYC Realty LLC*, No. CV 2010 01681 SLT, 2012 WL 1077706, at *12-13 (E.D.N.Y. Feb. 27, 2012), *quoting Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). A plaintiff may also show prejudice by showing that "any further delay would diminish her ability to collect on a judgment" against defendant. *77 Charters,* 2012 WL 1077706, at *12. This Court has also emphasized that strategic and/or bad-faith delays on the part of defaulting parties both establish prejudice and warrant the entry of default judgment. *Id.*, at *12-13, *citing In re Suprema Specialties, Inc.,* 330 B.R. 40, 54 (S.D.N.Y.2005) (finding prejudice established where "the Trustee … had a legitimate concern…that appellants were engaged in a deliberate strategy of bad faith delay").

In the instant case, Defendants have engaged in strategic and/or bad-faith delays by willfully refusing to appear or Answer the Complaint, as discussed *supra.* Defendants seem to think that if they simply ignore the Complaint, it will go away, and they will never have to pay Plaintiff the wages they owe her. This Court cannot tolerate such obstinate evasion and disregard for its rules.[1] Further, Defendant McErlain has spoken repeatedly to Plaintiff about his plan to

---

[1] Defendant McErlain's characteristic evasion and disregard for his legal responsibilities are further evidenced by the fact that Plaintiff has repeatedly witnessed McErlain saying "I never saw that!" or words to that effect, while theatrically crumpling up and discarding various tickets from the City of New York regarding violations pertaining to his business's outdoor café. (Mahoney Aff. ¶ 61) Additionally, McErlain paid Plaintiff off the books, and

open a new whiskey bar, and the financial struggle it has entailed. (Mahoney Aff. ¶ 59) Thus, Plaintiff has reason to be concerned that in the event of further delay, she will never be able to collect any judgment as Defendants will have already funneled those monies into opening a new business. *See e.g. 77 Charters*, 2012 WL 1077706 at *12-13 ("Because of the apparent financial problems of the defendants…any further delay could jeopardize plaintiff's ability to collect on a judgment.") *citing In re Suprema Specialties,* 330 B.R. at 54 (finding prejudice established where the non-defaulting party had a legitimate concern for its ability to collect any judgment, and for the possibility that defaulting parties were deliberate and strategically delaying in bad faith).

Lastly, Plaintiff would be prejudiced by the non-entry of a default judgment in that there is no other means by which she can collect the monies owed to her. *Mason Tenders*, 2003 WL 1960584, at *3 ("In light of Defendants' failure to respond, there is no indication that requiring Plaintiffs to take further steps…would be effective in eliciting a response from Defendants. Under these circumstances, denial of this motion would be unfairly prejudicial to Plaintiffs.") In light of Defendants' utter failure to respond to Plaintiff's Complaint, adjudication on the merits is not possible in the case at bar, and default judgment is the only remaining means by which Plaintiff may collect her unpaid wages for the work she has performed.

## II.    THE FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT ESTABLISH DEFENDANTS' LIABILITY.

The facts alleged in Plaintiff's Second Amended Complaint, which are deemed to be admitted with regard to Plaintiff's Motion for Default Judgment, clearly establish Defendants'

---

remarked to Plaintiff early in her employment that he had previously been in trouble with the IRS for paying employees "off the books" in order to shirk his payroll tax obligations and other legal responsibilities. (Mahoney Aff. ¶ 62)**.**

liability. Defendants failed and refused to compensate Plaintiff for her labor in accordance with State and Federal labor laws regarding minimum wage and overtime compensation. Defendants also unlawfully appropriated Plaintiff's tips in violation of State and Federal labor law. Furthermore, all of the above violations were willful, as opposed to merely negligent, which calls for liquidated damages. Therefore, Defendants are liable to Plaintiff for her unpaid wages plus prejudgment interest on those amounts pursuant to New York State law, as well as liquidated damages under both State and federal law, attorney's fees, costs and disbursements.

The particular facts alleged in the Second Amended Complaint, and in Plaintiff's Affidavit, where cited as such, are as follows:

1.      Mahoney was employed by Defendants from November 1, 2013 – March 31, 2014.

2.      Defendants initially told Mahoney that she would receive an IRS for W-2, and demanded he passport and social security number for I-9, payroll and accounting purposes.

3.      However, Defendants paid Mahoney "off the books," thereby avoiding the expense of providing her with payroll benefits such as unemployment compensation, workers' compensation and social security benefits.

4.      Mahoney's primary job duties did not involve the exercise of discretion or independent judgment.

5.      Mahoney had no managerial duties or managerial authority.

6.      Mahoney did not direct the work of other employees.

7.      Mahoney did not formulate or make any decisions concerning Defendants' standard practices or operating procedures.

8.      Mahoney was not authorized to deviate from Defendants standard practices and procedures.

9.      Defendants did not pay Mahoney on any set payment schedule, such as weekly or biweekly.

10.     Defendants did not pay Mahoney an hourly wage, but rather purported to pay her a "shift pay," i.e., a lump sum payment of $30.00 for a single shift (6.5 hours – 10.5 hours) or $70.00 for a double shift (14.5 hours).

11.     Defendants did not pay Mahoney any overtime for hours worked in excess of 40 hours per week.

12.     Defendants did not pay Mahoney any additional wages for those days in which she worked a "spread of hours" in excess of ten hours in a single workday.

13.     As a rule, Defendants did not permit Mahoney or any other bartenders to leave their shifts with their tips that were paid to them by customers through a charge on their credit cards ("charged tips"); rather, bartenders including Mahoney were only permitted to leave work with their cash tips from a given day's shift.

14.     Mahoney had no regular payday while she was employed by Defendants.

15.     Defendants appropriated and withheld Mahoney's charged tips, occasionally paying her arbitrary and sundry sums of cash which Defendant McErlain claimed was a mix of "shift pay" and charged tips, minus taxes.

16.     Defendants twice paid Mahoney in handwritten checks payable by "52 5th Avenue Corp.," first in the amount of $293.00 on January 2, 2014, and later in the amount of $575.00 on March 5, 2014. (Ex. A.)

17.     "Wages 12/9 – 12/15" was written on the memo line of the latter check, but nothing was written in the memo line of the former check.

18.     Defendants failed to pay Mahoney a substantial portion of her charged tips during the period of her employment.

19.     Defendants paid Mahoney sporadically in undifferentiated cash payments at their own convenience and discretion, regardless of any applicable pay period.

20.     Defendant McErlain told Mahoney that "taxes were withheld" from these unexplained, intermittent cash payments, but he never provided her with an IRS form W-2, which should have reflected such tax withholding.

21.     These undifferentiated combine cash payments totaled substantially less than Mahoney had earned in "shift pay" and charged tips while employed by Defendants.

22.     Mahoney had no regular payday while she was employed by Defendants.

23.     Between November 1, 2013 and March 31, 2014 – the entire period of Mahoney's employment by Defendants – Mahoney was paid on irregular and sporadic occasions.

24.     Mahoney complained directly to Defendant McErlain that she had not been paid the full amount of my earned wages and charged tips, to no avail.

25.     Mahoney asked Defendant McErlain to provide some explanation of how these payments were computed.

26.     Defendants failed and refused to provide Mahoney with any such explanation.

27.     Mahoney was never provided me with any wage statements by Defendants.

28.     Mahoney was never provided with any breakdown of charged tips and wages by Defendants.

29.    Mahoney was never provided with any wage or hour information regarding any payments made to her by Defendants.

30.    Mahoney was never provided with any written notice of her wage rate or pay schedule by Defendants.

31.    Mahoney was never provided with any information about a "tip credit" or any notice of tip credit application to her wages by Defendants.

32.    Mahoney asked Defendant McErlain to provide her with an explanation for how her wages were computed, but Defendant McErlain failed and refused to provide any such explanation.

33.    Mahoney left her employment at Cyprus Avenue on March 31, 2014, when an intoxicated patron of Black Sheep Pub next door, to whom Mahoney had not served any drinks, assaulted her and bit her, causing serious bodily injury.

34.    At the time that Mahoney left her employment, Defendants owed her substantial sums for unpaid wages, including but not limited to unpaid charged tips that she had earned during the period of her employment.

35.    On April 2, 2014, Defendant McErlain sent Mahoney a text message wherein he admitted that Defendants owed her unpaid wages and charged tips. (Mahoney Aff. ¶ 51) (Ex. B.)

36.    On April 3, 2014, Defendants paid Mahoney $1,000 in cash toward the balance of her unpaid wages and charged tips. (Mahoney Aff. ¶ 52)

37.    On May 5, 2014, Defendant called Mahoney and left a voice message wherein he expressly admitted to owing Mahoney approximately $3,000 worth of additional charged tips and wages and asked her to "come get what you're owed" and further stated that he did not like "hanging onto money that belongs to someone else."

38.    Mahoney replied to Defendant McErlain via text and repeatedly attempted to schedule a time for them to meet so that she could collect the balance of her unpaid wages and charged tips, notwithstanding the fact that the amount of such balance was far more than the amount that McErlain had admitted to owing her. (Mahoney Aff. ¶ 55) (Ex. C.)

39.    On May 8, 2014, Defendant McErlain sent Mahoney a text message indicating he knew that Mahoney was "seuing [sic] the bar" and that he was angry about it. (Ex. D.)

40.    On August 6, 2014, Defendant McErlain sent Mahoney a series of text messages, stating [*sic*]:

> I'll reach out u mid afternoon about ur monies owed…You were e. Played and paid by 52 5th Ave Corp. Dba Cyprus Avenue. Adam [Smith] owns that company not me. Adam has a lot of money. Legally Adam [Smith] is who you sue. I merely hold the liquor license in my name. I am not an employer…Small claims will get you your money in 2 weeks. U don't need a lawyer….sue him. That's how you get your money...Adam B. Smith…Ur W2 will confirm the employer info.

(Mahoney Aff. ¶ 55) (Ex. E.)

41.    Contrary to Defendant McErlain's text message above, Mahoney never received a W2 or any documents whatsoever from Defendants. (Mahoney Aff. ¶ 58).

**III.    THE FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT ESTABLISH THAT PLAINTIFF IS ENTITLED TO THE RELIEF REQUESTED.**

Plaintiff alleges in her Second Amended Complaint that she was employed by Defendants as a bartender from November 1, 2013 through March 2014. Thus, she worked for Defendants for a total of five months, or 21.12 weeks, 42 hours per week, without receiving hourly wages, overtime pay or spread of hours pay. Below are the calculations of the amounts owed by category. Because Defendants did pay Plaintiff some monies toward the balance of

wages owed to her, those amounts will be subtracted from the total amount owed after combining all categories.

### 1. Unpaid Tips Charged on Credit Cards

Plaintiff began keeping track of her unpaid charged tips on December 31, 2013[2], when she realized she could not count on McErlain to track her charged tips or to pay them to her in a timely fashion. Further, there were seven work days in January, 2014 for which she did not record her unpaid charge tips. For this reason, while Plaintiff has exact records of her unpaid charged tips from February and March 2014, she lacks exact records for wages and tips owed to her from November 2013, December 2013 and part of January 2014.

In order to approximate the amount of charged tips owed as accurately as possible, for November and December 2014, the monthly average of her recorded charged tips from February and March 2014 shall be applied in lieu of precise data from those months. For January 2014, that month's weekly average will be applied in lieu of missing week's worth of data from that month.

That monthly average from February and March 2014 is $1,151.20. The weekly average from January 2014 is $221.79. Therefore, the amounts of unpaid charged tips, owed to Plaintiff from each month of her employment by Defendants is approximates as follows:

- November, 2013: $1,151.20
- December, 2013: $1,151.20
- January, 2014: $877.17
- February, 2014: $1,173.56
- March, 2014: $1,128.84

---

[2] Because much of Plaintiff's shift beginning on the evening of December 31, 2013 technically occurred early the following morning on January 1, 2014, the earnings Plaintiff recorded for that shift shall be counted toward her earnings from the month of January, 2014.

Thus, Defendants owe Plaintiff a total of <u>**$5,481.97**</u> in unpaid charged tips.

**2.** <u>**Unpaid Minimum and Overtime Wages**</u>

Because Defendants never complied with any of the statutory prerequisites for applying a tip credit to the hourly minimum wage of tipped employees, Defendants are not eligible to apply a tip credit to Plaintiff's wages, and she is entitled to the full contemporaneous New York State minimum wage, which was, at all times relevant, $8.00 per hour. Based upon this hourly rate, Plaintiff's overtime rate for all hours worked in excess of 40 hours in a single work week is $12.00 per hour. Because Plaintiff worked 42 hours per week, she earned 40 x $8.00 per hour and 2 x $12 per hour each week. Thus, Defendants owe Plaintiff $344 in unpaid wages for each week that she worked for them.

In total, at the rate of 4.3 weeks per month (except February, which is only four weeks long), Plaintiff worked 21.2 weeks for Defendants, and therefore Defendants owe Plaintiff 21.2 x $344.00, which is <u>**$7,292.80**</u> in unpaid minimum and overtime wages.[3]

Combining the amount of unpaid wages and unpaid charged tips tallied above, Defendants owe Plaintiff a total of <u>**$12,774.77**</u> in unpaid wages and tips, less deductions for monies paid.

**3.** <u>**Spread of Hours**</u>

Under New York Labor Law, Plaintiff is entitled to "spread of hours" pay in the amount of one additional hour of pay for every workday in which she worked more than 10 hours. N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4. According to Plaintiff's work schedule, she worked three days in excess of 10 hours per week during the period of her employment. Therefore,

---

[3] Because the sundry cash payments made by Defendants were not broken down into separate amounts for unpaid charged tips and wages, for the sake of simplicity, all amounts paid are calculated herein as offsetting the total amount of unpaid charged tips, and all hours worked are calculated as unpaid hourly wages.

because Plaintiff worked a total of 21.2 weeks for Defendants, Defendants owe Plaintiff a total of 63.6 hours at the rate of $8.00 per hour, for a total of $508.80 in unpaid "spread of hours" wages. Adding this to the total amount of Plaintiff's unpaid wages and tips, Defendants owe Plaintiff a total of **$13,283.57**, less deductions for monies paid.

### 4. Liquidated Damages

Because this case involves the willful violation of state and federal labor laws, Plaintiff is entitled to an "equal additional amount" of liquidated damages amounting to 100 percent of her actual money damages under federal law, 29 U.S.C. § 216(b), as well as another 100 percent of such damages under state law. N.Y. Lab. Law § 198; *Mendez v. Casa Blanca Flowers, Ltd.*, No. 12-CV-5786 ENV JMA, 2014 WL 4258943, at *4 (E.D.N.Y. July 8, 2014) *report and recommendation adopted,* No. 12-CV-5786 ENV JMA, 2014 WL 4258988 (E.D.N.Y. Aug. 27, 2014). Because liquidated damages under the FLSA are compensatory, *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942), while liquidated damages under the NYLL constitute a penalty, *Reilly v. Natwest Markets Grp., Inc.*, 181 F.3d 253, 265 (2d Cir. 1999, Plaintiff is legally entitled to receive *both* the state and the federal liquidated damages award, rather than merely one or the other. *Mendez,* 2014 WL 4258943, at *4; *See also Yu Y. Ho v. Sim Enterprises, Inc.*, No. 11 Civ. 2855 (PKC), 2014 WL 1998237, at *19 (S.D.N.Y. May 14, 2014) (collecting cases); *Jin M. Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 CIV. 3725 DC, 2010 WL 4159391, at *5 (S.D.N.Y. Sept. 30, 2010).

While some courts in this Circuit have not permitted it, simultaneous recovery of liquidated damages is "the majority approach." *Ni v. Bat-Yam Food Servs. Inc.*, No. 113CV07274ALCJCF, 2016 WL 369681, at *2-3 (S.D.N.Y. Jan. 27, 2016); *Jaramillo v. Banana King Rest. Corp.*, No. 12 Civ. 5649 (NGG), 2014 WL 2993450, at *6 (E.D.N.Y. July 2, 2014)

(allowing recovery under both statutes and collecting cases). Indeed, this Court very recently recommended a simultaneous recovery of state and federal liquidated damages in *Gao v. Perfect Team Corp., et al.*, 2011 U.S. Dist. LEXIS 91223, No. 10-cv-1637 at *20-21 (Feb. 9, 2016).

Therefore, adding both the state and federal liquidated damages to the base amount of unpaid wages and charged tips owed to Plaintiff (not including prejudgment interest), Defendants owe Plaintiff a total of $13,283.57 x 3 = **$39,850.71**.

### 5. Prejudgment Interest

Plaintiff is entitled to nine percent (9%) annual prejudgment interest on the amount of unpaid wages and charged tips owed to her. *Mendez v. Casa Blanca,* 2014 WL 4258943, at *5. Note, however, that this interest rate does not apply to the liquidated damages under the FLSA, since the prejudgment interest and the federal liquidated damages share a compensatory, make-whole design and purpose. *Id.* Therefore, in the following calculations, nine percent annual interest will be applied to all damages except the amount of FLSA and NYLL liquidated damages.[4]

In order to simplify calculations, interest may be computed from a "single, reasonable, intermediate date" rather than the exact dates upon which each payment of wages was due and went unpaid. *Id.* The intermediate date between November 1, 2013 and March 31, 2014 is January 14, 2014. Therefore, interest has accrued from that date at the rate of nine percent per annum, which amounts to $2,616.97 for two years and one month on the principal amount of $13,283.17, adding $2,616.97 to the aforementioned subtotal of $39,850.71 means that as of this writing, Defendants owe Plaintiff approximately **$42,467.28** in unpaid wages, tips prejudgment interest to date.

---

[4] No deductions have been made for interest from the amount paid by Defendant Smith, as that amount did not include interest.

|  | November | December | January | February | March | TOTAL |
|---|---|---|---|---|---|---|
| Charged tips | $1,151.20 | $1,151.20 | $877.17 | $1,173.56 | $1,128.84 | $5,481.97 |
| Minimum wage | $1,367.00 | $1,367.00 | $1,367.00 | $1,280.00 | $1,367.00 | $6,784.00 |
| Overtime | $103.20 | $103.20 | $103.20 | $96.00 | $103.20 | $508.80 |
| Spread of hours | $103.20 | $103.20 | $103.20 | $96.00 | $103.20 | $508.80 |
| Subtotal |  |  |  |  |  | $13,283.17 |
| Liquidated Damages (FLSA & NYLL) |  |  |  |  |  | $26,567.14 |
| NYLL 9% annual pre-judgment interest on $13,283.57 for two years and one month |  |  |  |  |  | $2,616.97 |
| TOTAL |  |  |  |  |  | $42,467.28 |

### 6. Deductions for Monies Paid

As alleged in the Second Amended Complaint, Mahoney was twice paid in handwritten checks payable by "52 5th Avenue Corp.," first in the amount of $293.00 on January 2, 2014, and later in the amount of $575.00 on March 5, 2014. Therefore, she was paid a total of $868.00 by check, toward the balance of her unpaid wages and charged tips.

Further, during the course of her employment, Plaintiff was paid a few times in undifferentiated cash payments. She estimates that this occurred on four occasions during the course of her employment, in the amounts of $200.00, $300.00, $400.00 and $500.00, respectively. Additionally, on or about April 3, 2014, after leaving her employment, Plaintiff was paid $1,000.00 in cash toward the balance of her unpaid wages and charged tips. Therefore, by her best estimation, she was paid a total of $2,400.00 in cash and $868.00 in checks, for a total combined payment of $3,268 toward the balance of her unpaid wages and charged tips.

21

Lastly, Plaintiff has reached a $7,500.00 settlement agreement with Defendant Smith. Of that amount, $1,209.27 was allocated to unpaid wages, $1,209.27 was allocated to FLSA liquidated damages, $1,209.27 was allocated to NYLL liquidated damages, $2,500.00 was allocated was allocated to attorneys' fees and $1,372.19 was allocated for reimbursements for costs of this action.

| Unpaid wages | $1,209.27 |
| FLSA Liquidated damages | $1,209.27 |
| NYLL liquidated damages | $1,209.27 |
| Attorneys' fees | $2,500.00 |
| Costs | $1,372.19 |
| **TOTAL** Smith Settlement | **$7,500.00** |

Therefore, Plaintiff has been paid a total of $3,627.81 toward $42,467.28 in unpaid wages, tips, prejudgment interest to date, and the remaining balance owed to her by Defendants is **$38,839.47.**

### 7. Attorneys' Fees

#### a. Hourly Rate

In order to determine a reasonable hourly rate for the legal services performed, the Second Circuit has adopted the following factors, *inter alia,* to guide the inquiry: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *La Barbera v. Fed.*

22

*Metal & Glass Corp.*, 666 F. Supp. 2d 341, 353-54 (E.D.N.Y. 2009), citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections,* 522 F.3d 182, 187 n. 3 (2d Cir.2008).

   Courts are also instructed to consider the complexity and difficulty of the case, the resources required to prosecute the case effectively, the timing demands of the case, whether the attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether the attorney might have initially acted *pro bono*, and other returns, e.g. enhanced reputation, that the attorney might expect from the representation. *La Barbera v. Fed. Metal & Glass Corp.*, 666 F. Supp. 2d at 353-54.

   While courts in this Circuit tend to regard default judgment actions as relatively simple legal matters, this is but one factor in the analysis. *Id.* Further, the instant case has been much more difficult than the typical default judgment action, due to Defendant McErlain's continual evasion, obfuscation and deceit. For example, McErlain sent Plaintiff a series of text messages and voice mails in which he strung her along, pretending as though he intended to meet her and pay her her wages. This required more consultation time between Plaintiff and her counsel. Further, McErlain sent Plaintiff a series of text messages in which he boldly denied any ownership in the Cypress Avenue bar and told Plaintiff that his employee, Adam Smith, actually owned the bar. (Ex. E.) This created substantial additional work for Plaintiff's counsel in terms of ferreting out the true ownership of the bar, including both computer research and correspondence with the relevant state agencies, e.g. the Kings County Clerk and the New York State Liquor Authority, for ownership documents.

   Looking to the other the other factors, it follows that due to the enhanced workload of this action described above, it follows that accepting this action has also significantly precluded

Plaintiff's counsel from accepting other and/or additional employment through other clients. Further, Plaintiff's counsel has accepted this case on contingency, despite the fact that a) the amount in controversy is quite small relative to counsel's other cases, making it "undesirable," and b) counsel's customary hourly rate is $575.00, due to Ms. Auster's 38 years of experience in labor and employment law, talent, ability and reputation. Lastly, Plaintiff's counsel has no independent interest in this litigation, and counsel's representation of Plaintiff does not entail the possibility of collateral benefits such as enhanced reputation. In aggregate, all of the above factors weigh heavily in favor of an enhanced hourly fee, and the Law Offices of Gail I. Auster and Associates, PC, respectfully requests that compensation be awarded in the amount of their standard hourly fees, which are $575.00 per hour for Ms. Auster (principal and president) $300.00 for Ms. Liederman (associate attorney) and $225.00 per hour for the paralegal services of Ms. Mayer.

### b. Number of Hours

In determining whether the number of hours expended by a plaintiff's counsel is reasonable, this Circuit instructs judges to "use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent and rates charged in a given case." *Id.* at *8 (quoting *Clarke v. Frank,* 960 F.2d 1146, 1153 (2d Cir.1992)). Here, Ms. Auster spent 34.9 hours, Ms. Liederman spent 214.6 hours and Ms. Mayer spent 1 hour. (Aff. of GIA) (Ex. P, Q, R.) Therefore, the attorneys' fees incurred in this action are as follows:

| Gail I. Auster, Esq. (partner & principal) | 34.9 x $575 = $20,067.50 |
| Chloe Liederman, Esq. (associate attorney) | 214.6 x $300 = $64,380.00 |
| Ellen Mayer (paralegal) | 1 x $225 = $225.00 |
| **TOTAL** | **$84,672.50**[5] |

---

[5] In that Defendant Smith's settlement provided for attorneys' fees in the amount of $2,500.00, the total attorneys' fees now sought is in the amount of $82,172.50.00.

It is understood that the Court may adjust the attorney's fee award in accordance with applicable law.

**8.   Costs**

Costs have been allocated to the settlement amount paid by Defendant Smith, individually.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that default judgment be ordered against Defendant, individually and severally, in the amount of **$123,511.97**.

Dated:          New York, New York
                March 21, 2016


                                        Respectfully submitted,


                                        LAW OFFICES OF GAIL I. AUSTER
                                        & ASSOCIATES, P.C.

                                        By: Gail I. Auster, Esq.
                                        *Attorneys for Plaintiff*
                                        17 Battery Place, Suite 711
                                        New York, NY 10004
                                        Telephone: 212.864.3461
                                        Cell: 914.707.4000
                                        Facsimile: 212.864.2228

25